# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**JENNIFER DAVIS o/b/o J.E.C, a minor,**
                    **Plaintiff,**

        **v.**                                            **Case No. 14-C-104**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
                    **Defendant.**

## DECISION AND ORDER

Plaintiff Jennifer Davis, on behalf of her minor son, J.E.C., seeks judicial review of the termination of J.E.C.'s social security disability benefits. The Social Security Administration ("SSA") initially awarded benefits in May 1997, shortly after J.E.C. was born, based on his prematurity and low birth weight.[1]  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 100.02. The SSA conducted periodic disability reviews, continuing J.E.C.'s benefits in 2004 based on attention deficit hyperactivity disorder ("ADHD") and borderline intellectual functioning ("BIF"). See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.11. The SSA initiated another review in 2008, this time finding that J.E.C.'s condition had improved such that he was no longer disabled, terminating benefits as of May 2009. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), but the ALJ agreed that J.E.C. was no longer entitled to benefits. The Appeals Council denied plaintiff's request for review, leaving the ALJ's decision as the final word from the Commissioner of Social Security for purposes of judicial review. See Schomas v. Colvin, 732

---

[1]J.E.C. was also diagnosed with hydrocephalus, a condition causing excessive accumulation of fluid in the brain. Doctors surgically implanted a shunt – a flexible but sturdy plastic tube designed to divert the flow of fluid to another area of the body. (Tr. at 505-11.) See http://www.ninds.nih.gov/disorders/hydrocephalus/detail_hydrocephalus.htm.

F.3d 702, 707 (7th Cir. 2013).

## I. STANDARD OF REVIEW

I review the ALJ's decision to ensure that he supported it with "substantial evidence" and applied the proper legal criteria. Allord v. Astrue, 631 F.3d 411, 415 (7th Cir. 2011). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Murphy v. Colvin, 759 F.3d 811, 815 (7th Cir. 2014). This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that the court scours the record for supportive evidence or looks for reasons to uphold the ALJ's decision; rather, the ALJ must identify the relevant evidence and build a "logical bridge" between that evidence and the ultimate determination. Moon v. Colvin, No. 13-3636, 2014 WL 3956762, at *2 (7th Cir. Aug. 14, 2014). The court must conduct a critical review of the record, considering both the evidence that supports, as well as the evidence that detracts from, the ALJ's decision; a decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. Scrogham v. Colvin, No. 13-3601, 2014 WL 4211051, at *8 (7th Cir. Aug. 27, 2014). Nor may the Commissioner's lawyers prop up an inadequate decision by citing evidence the ALJ did not mention or providing reasons for the denial the ALJ did not give. See, e.g., Hanson v. Colvin, 760 F.3d 759, 762 (7th Cir. 2014); Pierce v. Colvin, 739 F.3d 1046, 1050 (7th Cir. 2014) (citing SEC v. Chenery Corp., 318 U.S. 80, 87-88 (1943)).

## II. DISABILITY STANDARDS

This case involves a "continuing disability review," in which the agency re-evaluates the person's impairments to determine whether he still qualifies for benefits. See 20 C.F.R. § 416.994a. The review involves three steps. First, the SSA considers whether the person has

experienced "medical improvement" since the most recent favorable determination (called the "comparison point decision" or "CPD"). If not, the SSA will, subject to a few exceptions, find that the claimant is still disabled. Id. § 416.994a(b)(1). Second, if the SSA finds medical improvement, it will determine whether the person's impairment still meets or equals the severity of the Listing it met or equaled at the time of the previous determination.[2] If so, the SSA will find the claimant still disabled, unless an exception applies. Id. § 416.994a(b)(2). Third, if the impairment no longer meets or equals the Listing it previously met or equaled, the SSA will decide whether the person is currently disabled, considering all of the impairments he now has. Id. § 416.994a(b)(3). At this third step, if a child-claimant's current, severe impairments do not meet or equal a Listing, the SSA must decide whether they "functionally" equal a Listing. Id. § 416.926a(a). This is done by evaluating his degree of limitation (i.e., extreme, marked, less than marked, or no limitation) in six "domains": (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well-being. Id. § 416.926a(b)(1). The SSA will find a child disabled if he has "marked" limitations in two domains or an "extreme" limitation in one domain. Id. § 416.926a(a).

## III. PROCEEDINGS BEFORE THE ALJ

### A.     The Hearing

Plaintiff and J.E.C. appeared for their hearing before the ALJ on October 16, 2012.[3] (Tr.

---

[2]The Commissioner has compiled a list of conclusively disabling impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1, (i.e., the "Listings").

[3]Plaintiff's initial request for a hearing was dismissed when she failed to appear before the ALJ on August 17, 2010. (Tr. at 403-04, 614-17.) However, the Appeals Council found good cause for her failure and remanded the case for a hearing. (Tr. at 407-08.)

at 618.)  The ALJ asked plaintiff if she was aware that she was entitled to be represented, and she said yes.  He then had her review and sign a waiver of representation form.  (Tr. at 613, 623.)  The ALJ also added to the record some additional materials plaintiff brought.  (Tr. at 624-25.)

J.E.C. testified that he was 15 years old and in the 9th grade.  (Tr. at 630-31.)  He said he was doing good in school.  (Tr. at 631.)  He previously played on the school basketball team but stopped this year.  (Tr. at 631.)  He said that he had friends in school and got along with them.  (Tr. at 632.)  He had been suspended once that year (for three days) for coming to class late.  (Tr. at 632-33.)  He indicated that he had been suspended once or twice in eighth grade but could not remember why.  (Tr. at 633.)  His favorite subject was social studies.  (Tr. at 634.)  He was in special education about three hours per day, regular classes the rest of the day, receiving special help in math and reading.  (Tr. at 634.)  He indicated that he generally did his homework.  (Tr. at 635.)  He also did his chores at home but sometimes needed reminders.  (Tr. at 635-36.)  He lived with his mother, younger brother, and older sister, with whom he got along.  (Tr. at 636-37.)  His sister helped him with homework.  (Tr. at 637.)  After school, he watched TV, played video games, and played basketball with his friends.  (Tr. at 640, 642.)

Plaintiff testified that J.E.C. loved basketball but sometimes could not play because of headaches.  (Tr. at 644.)  He took medication, which helped but caused him to sleep a lot.  (Tr. at 645.)  Plaintiff indicated that J.E.C. had to be supervised doing things because his philosophy was, he's tired and he doesn't want to do it.  He had received mental health care in the past, but the therapist left and there was no one to see him, so he was dismissed from the clinic.  He took medication for ADHD (Tr. at 647), which plaintiff gave him at night, before he went to bed (Tr. at 648).  The medication did not help him the next day at school and also

4

made him drowsy. Plaintiff initially testified that J.E.C. had been on Adderall[4] since around age seven or eight (Tr. at 648) but then corrected her testimony her to indicate that there was a gap before he recently resumed the medication (Tr. at 649). Plaintiff testified that J.E.C. worked hard in school but still struggled, despite being in special education classes part-time and receiving one-on-one help. (Tr. at 650-52.) He needed help from his sister to compete his homework. (Tr. at 652.)

## B.    The ALJ's Decision

On November 9, 2012, the ALJ issued an unfavorable decision. Following the three-step process outlined above, the ALJ concluded that J.E.C. had medically improved, that he no longer met the Listing from the CPD (§ 112.11 for ADHD), and that he did not functionally equal the Listings. (Tr. at 22-23.)

The ALJ noted that J.E.C. was 15 years old, with a birth date of April 21, 1997. He was currently in the 9th grade, primarily in regular classes, spending about three hours per day in special education. J.E.C. testified that he was doing okay in school, while his mother stated that he struggled completing homework due to his ADHD, with his sister helping him. The ALJ noted that despite past behavioral issues noted in the record, J.E.C. had been suspended just once in the current year and once in the prior year. (Tr. at 18.)

The ALJ reviewed J.E.C.'s Individualized Education Program ("IEP") reports dating back to 2001, when he was found to have a speech/language impairment. By 2004, that was no longer an issue, being replaced by ADHD. Reports from 2007 and 2008 cited serious issues with behavior and motivation, but the 2011-12 IEP seemed more upbeat regarding his attitude

---

[4]Adderall is a stimulant used to treat ADHD. http://www.drugs.com/adderall.html.

and motivation. (Tr. at 18.) However, the most recent report, for 2012-13, noted increased concerns, including pre-occupation with electronics, leaving the room without permission, mean-spirited outbursts, avoiding assignments and ignoring redirection attempts, a general refusal to cooperate, and disrespectful speech towards teachers. (Tr. at 18-19.) Academically, he had improved slightly, but attendance remained a concern, with the last IEP noting an attendance rate of just 68%. (Tr. at 19.)

The ALJ noted that J.E.C. was initially found disabled because of low birth weight, with an additional diagnosis of hydrocephalus requiring shunt placement. Subsequent CT scans showed the shunt in place and functioning normally. Other medical treatment records noted checkups for J.E.C.'s asthma, with no exacerbations mentioned; treatment for a concussion after a fall in 2008; neck pain following a school bus accident in 2006; and a skin rash and nose bleeds in 2009. (Tr. at 19.) Following the cessation of his benefits, plaintiff underwent another CT scan in 2010 following headache complaints, which again revealed the shunt was stable. He also had visits to Children's Hospital in 2011 and 2012 for gynecomastia and pneumonia, and to his regular doctor for medication refills and general follow-up, with no significant medical findings noted. (Tr. at 19.) Regarding his mental status, J.E.C. received Adderall for ADHD, but treatment was otherwise intermittent. The ALJ stated that J.E.C. was discharged from Acacia Mental Health Clinic in 2011 due to missed appointments. (Tr. at 20.)

The ALJ then turned to the medical opinions reports. William Nimmer, Ph.D., evaluated J.E.C. in January 2009 as part of the SSA reevaluation. Dr. Nimmer noted no ADHD behaviors during the course of the evaluation, with attention and concentration quite good. Asked about school, J.E.C. and plaintiff both stated that J.E.C. was doing well and got along with everyone. Dr. Nimmer administered testing, which revealed a full scale IQ of 72, with subcategories

6

ranging from 68 to 97, "the variability in terms of those scores felt to be consistent with a learning disorder and/or borderline intellectual functioning." (Tr. at 20.) Dr. Nimmer detected no behavioral or emotional problems during the interview, diagnosing learning disorder, not otherwise specified; rule out ADHD by history; and BIF; with a GAF of 65-70,[5] "suggesting claimant to be quite functional." (Tr. at 20.)

State agency medical staff concluded that notwithstanding his BIF, ADHD, and asthma, J.E.C. did not have an impairment that met, medically equaled, or functionally equaled a Listing. (Tr. at 20-21.) They found less than marked or no limitations in the domains. (Tr. at 21.) The ALJ stated that he was "inclined to concur" with this evaluation. Low birth weight was no longer an issue, as J.E.C's height and weight were normal for his age, and the shunt appeared to be functioning well with no complications relating to hydrocephalus. "There have been some complaints of headache, but there is no evidence to suggest it is related to the hydrocephalus and in any event it would not be incapacitating." (Tr. at 21.) J.E.C.'s asthma appeared to be in good control with inhalers, with few if any exacerbations noted in the record, and J.E.C.'s activities suggested a fairly active child. The ALJ concluded that the intermittent nature of his medical visits also suggested a well, healthy boy. (Tr. at 21.)

The ALJ noted that the more relevant issues at the present involved J.E.C.'s mental

---

[5] GAF stands for "Global Assessment of Functioning," which rates the severity of a person's symptoms and his overall level of functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting himself or others. Scores of 61-70 reflect "mild" symptoms. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000). The fifth edition of the DSM, published in 2013, abandoned the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." Williams v. Colvin, 757 F.3d 610, 613 (7th 2014) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013)).

status, including ADHD and some cognitive/academic delays, which formed the basis for continued disability in 2004. The ALJ stated that the hyperactivity previously noted "may or may not be related to prematurity." (Tr. at 21.)

> Given the prevalence of ADHD in conjunction with many of the children's Supplemental Security Income cases that undersigned sees, it could be the result of any of a number of factors. Regardless, claimant is not mentally retarded and given the wide fluctuation in some of his IQ scores, some of which reached the 90's it is very likely that claimant's academic problems may be more due to a learning disorder as opposed to borderline intelligence.

(Tr. at 21.) The ALJ noted that the IEP's did not identify a cognitive problem, but rather an "other health impairment," i.e., ADHD. The report from Dr. Nimmer questioned the ADHD diagnosis, however, focusing more on the test results suggesting BIF and a learning disorder. Dr. Nimmer's GAF score suggested a functional person. (Tr. at 21.)

The ALJ noted that J.E.C. had been making some progress in school and attributed his recent decline to poor attendance. "Obviously if claimant refuses to regularly attend school, his potential for progress will be compromised." (Tr. at 21.) "[R]egardless of how counterproductive those actions may be, they are a reflection of personal volition on the part of claimant and should not be viewed as justification for continuing to allow claimant to receive disability benefits." (Tr. at 22.) The ALJ concluded:

> The undersigned believes that claimant does have an attention deficit disorder, but that with medication it is under good control. His academic delays may or may not be related to such. Whether a learning disorder or lower intelligence could also be a factor is less than completely clear. It is always difficult to sort out all of the potential causes for one's deficiencies when a number of different factors are present. The undersigned [is] not willing to completely embrace Mr. Nimmer's assessment of borderline intelligence, especially when Milwaukee Public School officials have yet to find such. The possibility of a learning disorder in combination with an attention deficit disorder seems more likely.

> Whatever the exact etiology for claimant's academic deficiencies, at this point those deficiencies do not seem all that severe and with a little more effort and

motivation on the part of claimant the prognosis for success is good. Both claimant and his mother appeared quite credible at the hearing and claimant presented himself in a very appropriate and respectful manner.

Absent additional evidence to suggest otherwise the undersigned finds that there has been medical improvement in claimant's status to the point he no longer has an impairment or combination of impairments that would meet or equal a listing. As to the issue of functional equivalence, the undersigned finds less than marked limitations in five of the six domains, the only exception being moving about and manipulating objects for which he finds no limitation whatsoever.

(Tr. at 22.)

## IV.  DISCUSSION

Plaintiff argues that the ALJ failed to obtain a proper waiver of the right to counsel; failed to properly consider and evaluate Listings 112.05 and 112.11, as well as functional equivalence to the Listings; and relied on speculation rather than record evidence.  I address each argument in turn.

## A.  Waiver of Counsel

### 1.  Standard

Social security claimants have a statutory right to be represented by counsel.  Skinner v. Astrue, 478 F.3d 836, 841 (7th Cir. 2007) (citing 42 U.S.C. § 406; Nelson v. Apfel, 131 F.3d 1228, 1231 n.1 (7th Cir.1 997); Binion v. Shalala, 13 F.3d 243, 244 (7th Cir. 1994); Thompson v. Sullivan, 933 F.2d 581, 584-85 (7th Cir. 1991)).  This right may be waived, Thompson, 933 F.2d at 584, but in order to ensure a valid waiver the ALJ must explain to pro se claimants (1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25% percent of past due benefits and required court approval of the fees, Binion, 13 F.3d at 245; Thompson, 933 F.2d at 584.  If the ALJ fails to obtain a valid waiver, the matter must be remanded for a new

hearing unless the Commissioner can establish that the ALJ fully and fairly developed the record. Blom v. Barnhart, 363 F. Supp. 2d 1041, 1046 (E.D. Wis. 2005). The ALJ's duty is met if he probes the claimant for possible disabilities and uncovers all of the relevant evidence. Id. If the Commissioner makes the required showing, the plaintiff has the opportunity to rebut this showing by demonstrating prejudice or an evidentiary gap. Id.

**2. Analysis**

As indicated above, at the beginning of the hearing in this case the ALJ obtained from plaintiff a waiver of the right to representation. I set forth their colloquy:

> ALJ: Okay. I need to communicate certain information. So you are aware that you are entitled to be represented in this matter?
>
> WTN: Yes, sir.
>
> ALK: Okay. And did you try to get a lawyer and found that you were unable to?
>
> WTN: Yes, sir.
>
> ALJ: Okay. So we got that out of the way. I have a form that's typically used. I'd like you to read the form and sign it, to let me know you understand your – have an availability of a lawyer, you didn't have an opportunity to get – or excuse me, you tried to get a lawyer. You were unable to get a lawyer?
>
> WTN: Yes.
>
> ALJ: To that, I sent out lawyer recommendations –
>
> WTN: Yes, you did.
>
> ALJ: – and agencies that'll help you for free. Are you in pay status by chance? Are you still getting payments?
>
> WTN: No, sir.

(Tr. at 623.) After some further discussion about when J.E.C.'s checks actually stopped, the ALJ continued:

> ALJ: Okay. So it takes a little bit of time. But I thought maybe that would be a problem but that's not a problem for you. But you were unable to get a lawyer after you attempted.
>
> You don't need a lawyer. If you sign that form then we're able to proceed but then I'm going to ask you about the material in the case, if you have any objection to it being admitted. . . .
>
> All right. I'm going to give you the form. Read and sign the form. I'll give you the file. We'll go off the record while she does this and when she is ready, if you could buzz me. Then we'll come back and we'll get going. Okay? Any other questions before I leave you?
>
> WTN: Nothing I could think of right off hand.

(Tr. at 624-25.) The ALJ then went off the record. When he returned:

> ALJ: And we've gone over your rights to representation. You've read and signed my form and you are ready to proceed today, are you not?
>
> WTN: Yes, sir, that's correct.

(Tr. at 626-27.)

The ALJ alluded to free representation, but his colloquy otherwise failed to satisfy Thompson and Binion. The waiver form plaintiff signed did a little better, but it too fell short. In the form, plaintiff acknowledged her right to be represented, that she received a referral list of legal service providers, that a representative could help her prepare and present the case, and that if she did not get a representative the judge would make a reasonable effort to ensure that all relevant evidence was made part of the record. (Tr. at 613.) However, the form failed to advise plaintiff of the 25% limitation on attorney fees. It is disheartening that in the 20+ years since Thompson was decided the SSA has been unable to develop a colloquy or come up with a waiver form complying with circuit precedent.

The Commissioner responds that prior to the hearing the ALJ twice advised plaintiff in writing of her right to representation, including the possibility of free representation and of the

11

25% cap on attorneys' fees. Plaintiff replies that there is no indication she received these mailings. I agree with her as to the first, but not the second.

On April 5, 2010, the ALJ sent plaintiff a letter acknowledging her request for a hearing. (Tr. at 53-54.) Enclosed with that letter was an SSA publication called "Your Right To Representation." (Tr. at 55-56.) As indicated above, plaintiff failed to appear for the initial hearing in August 2010, resulting in dismissal of the case. Plaintiff argued in her request for review of the dismissal that she did not receive notice of the hearing, which the Appeals Council apparently accepted in remanding the case. (Tr. at 407-08.) There is no other indication in the record that plaintiff received the ALJ's communications at that time. Thus, it would be inappropriate to conclude that any written advice of rights purportedly sent in 2010 could salvage the 2012 waiver.

The SSA again sent plaintiff the "Your Right To Representation" form along with the September 14, 2012 notice of hearing after the Appeals Council remand. (Tr. at 409, 415-16.) The record contains plaintiff's signed acknowledgment of receipt of this notice of hearing (Tr. at 24), and at the October 16, 2012 hearing, plaintiff acknowledged on the record that the ALJ had sent her lawyer recommendations and agencies that would help her for free (Tr. at 623). Plaintiff makes no affirmative claim that she did not receive the form in September 2012, and the record contains evidence suggesting she did.

Although the Seventh Circuit has not addressed whether the "Your Right To Representation" form satisfies Thompson and Binion, several district courts have indicated that it can. See, e.g., Moore v. Astrue, 851 F. Supp. 2d 1131, 1141 (N.D. Ill. 2012) (holding that this form, combined with a signed and returned acknowledgment of receipt, satisfies the Seventh Circuit standard); Seamon v. Barnhart, No. 05-C-13-C, 2005 WL 1801406, at *10 (W.D. Wis.

12

July 29, 2005) ("I conclude that mailing written notices to plaintiff could satisfy the commissioner's burden, but only if the ALJ establishes at the hearing that the claimant received, read and understood the notices."); <u>DeLong v. Barnhart</u>, No. 00-C–0222-C, 2001 WL 34379614, at *2 (W.D. Wis. Dec. 12, 2001) (finding that the "Social Security and Your Right to Representation" form contained all required information); <u>see also</u> <u>Howe v. Astrue</u>, No. 12-93, 2013 WL 593975, at *1 (W.D. Pa. Feb. 14, 2013) ("Our Court of Appeals, and my sister courts, have repeatedly held that a claimant was sufficiently advised of his right to counsel when he had received multiple written notifications of that right, including SSA Publication No. 05-10075, 'Your Right to Representation.'"); <u>Andrews v. Astrue</u>, 917 F. Supp. 2d 624, 643 (N.D. Tex. 2013) (finding the "Your Right To Representation" form sufficient). The form advises claimants in plain language what a representative can do for them, that some organizations give free legal services, that fees must be approved, and that fees generally cannot exceed 25% of past due benefits. (Tr. at 415-16.)

Plaintiff makes no argument that the form fails to satisfy <u>Thompson</u> and <u>Binion</u> or that the required information must always be relayed orally. On the other hand, the record contains no evidence that plaintiff read and understood the form. In any event, regardless of the validity of the waiver, the ALJ always has a duty to fully and fairly develop the record when the claimant proceeds without counsel. <u>See</u> <u>Nelson</u>, 131 F.3d at 1235; <u>see also</u> <u>Binion</u>, 13 F.3d at 245 ("The ALJ has this same duty to develop the record when a plaintiff is without counsel regardless of whether the plaintiff's waiver of counsel was valid.").[6]

The court will usually require a significant omission before finding that the ALJ failed to

---

[6]The validity of the waiver determines who has the burden on this issue: if invalid– the Commissioner, if valid – the claimant. <u>See</u> <u>Nelson</u>, 131 F.3d at 1235 n.3.

assist a pro se claimant in developing the record, <u>Luna v. Shalala</u>, 22 F.3d 687, 692 (7th Cir. 1994), and the Commissioner notes that in this case the ALJ held a lengthy hearing, with plaintiff identifying no testimony the ALJ failed to elicit or records he failed to obtain. This case nevertheless provides an example of how the absence of counsel can impede the full and fair consideration of a claim. <u>See</u> <u>Henderson v. Barnhart</u>, 205 F. Supp. 2d 999, 1010 (E.D. Wis. 2002) ("The absence of counsel cannot be assumed to be harmless. While ALJs may conscientiously attempt to fulfill their duties to develop the record, even the most thorough ALJ is no substitute for an advocate.").

Plaintiff appeared confused at the outset of the hearing, indicating, "I want to start off by saying it's a lot of things that I don't understand[.]" (Tr. at 620.) The ALJ asked if she had reviewed the file (as a precursor to asking if she objected to the admission of the exhibits it contained), and she replied, "what am I looking for in there?" (Tr. at 622.) During the ensuing waiver colloquy, the ALJ told plaintiff, "You don't need a lawyer." (Tr. at 624.) It seems plain that she did. At two points during the hearing plaintiff referenced medical records she was unable to obtain. (Tr. at 638 – "when I went to request the records they didn't give me the rest of the medication in both records"; Tr. at 646 – "No, I do not have those records [regarding ER visits for headaches].") The ALJ did not follow up. Further, plaintiff's testimony about J.E.C.'s medications at times seemed confused. Before the state hearing officer in February 2010, she apparently testified that J.E.C. no longer took Adderall. (Tr. at 41.) Before the ALJ, she initially said, "he was always taking the Adderall" (Tr. at 648), but then backtracked, indicating that he had stopped but recently resumed Adderall (Tr. at 649). Later in the hearing, after plaintiff testified about J.E.C.'s problems with focus, the ALJ asked, "haven't they given him medication for that?" (Tr. at 657.) Plaintiff responded, "No, he has not had medication for that." (Tr. at

657.)  The ALJ reminded her that J.E.C. was prescribed medication for ADHD, and plaintiff responded, "Is that what that's for?"  (Tr. at 658.)  Plaintiff also indicated that J.E.C.'s medications made him drowsy, apparently referring to Adderall (Tr. at 649-50), but Adderall is a stimulant with common side effects of anxiety, agitation, and insomnia.[7]  Finally, when given an opportunity to add to her testimony at the end of the hearing, plaintiff spoke of J.E.C.'s shunt, wondering how he could not be deemed disabled when he could not live without it.  (Tr. at 655-56.)

I make these observations not to belittle plaintiff's efforts to present her son's case but rather to highlight the confused and incomplete hearing that occurred in the absence of counsel.  See Henderson, 205 F. Supp. 2d at 1010 ("An attorney will likely know beforehand the areas crucial to the claimant's case and can ensure that questioning in those areas is detailed, and that the record (both testimonial and medical) is complete.  Therefore, federal courts must carefully scrutinize records developed without counsel.").[8]  Coupled with the errors discussed below, this requires remand.[9]

---

[7]See http://www.drugs.com/adderall.html.  Plaintiff also referred to J.E.C.'s headache medication causing him to sleep most of the day.  (Tr. at 645.)  A common side effect of Amitriptyline is drowsiness.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682388.html.

[8]As discussed below, medical records show that in 2009 J.E.C. received in-home assistance with his personal care, including problems with incontinence.  (Tr. at 371-73.)  The ALJ asked no questions about this.

[9]I note that plaintiff was represented by a lawyer before the Appeals Council and is represented by counsel in this court.  Thus, this is not case in which plaintiff would have little chance of finding a lawyer to help her on remand.

**B.  Listings**

    **1.  Standard**

In order to meet a Listing, the claimant must show that his impairment satisfies all of the various criteria specified in the Listing.  Ribaudo v. Barnhart, 458 F.3d 580, 583 (7th Cir. 2006).  A claimant can medically equal a Listing if he has an impairment set forth in the Listings, does not exhibit one or more of the findings specified in the particular Listing, but has other findings related to his impairment that are at least of equal medical significance to the required criteria.  20 C.F.R. § 416.926(b).  In considering whether a claimant's condition meets or equals a Listing, the ALJ must discuss the Listing by name and offer more than a perfunctory analysis.  Kastner v. Astrue, 697 F.3d 642, 647 (7th Cir. 2012); Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004).  Further, in a case involving continuing disability review, the ALJ must determine whether the claimant satisfies any Listing, not just those addressed in the CPD.  See 20 C.F.R. § 416.994a(b)(3).  Finally, as indicated above, if a child-claimant does not meet or equal any Listing, the ALJ must address functional equivalence under the six domains.  Id. § 416.926a.

    **2.  Analysis**

In the CPD, J.E.C. was found to meet Listing 112.11 based on his ADHD.  The ALJ found that he no longer met that Listing, nor did he meet, equal, or functionally equal any other Listing.

        **a.  Listing 112.05 (Intellectual Disability)**

Plaintiff first argues that the ALJ failed to address Listing 112.05, intellectual disability (mental retardation).  This Listing provides, in pertinent part:

> Intellectual Disability:  Characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning.

The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied.
. . .
D. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function;
OR
E. A valid verbal, performance, or full scale IQ of 60 through 70 and:
. . .
2. For children (age 3 to attainment of age 18), resulting in at least one of paragraphs B2b or B2c or B2d of 112.02 [i.e., marked impairment in age-appropriate social functioning, age-appropriate personal functioning, or maintaining concentration, persistence, or pace.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.05.

Plaintiff points to Dr. Nimmer's WISC-IV (Wechsler Intelligence Scale for Children) testing, which produced the following scores – verbal comprehension index 77, perceptual reasoning index 71, working memory index 97, processing speed index 68, and full scale IQ 72. Dr. Nimmer noted that these findings were "essentially commensurate" with the results of an assessment conducted four years previously at the time of the CPD (Tr. at 348), which revealed a verbal IQ score of 74, performance IQ of 66, and full scale finding of 68 (Tr. at 345).

The ALJ acknowledged Dr. Nimmer's scores (Tr. at 20), some of which fell below 70,[10] but he failed to analyze the case under Listing 112.05.[11] It is true that an ALJ need not accept

---

[10]"In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series, the lowest of these is used in conjunction with listing 112.05." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00D.9.

[11]As plaintiff notes, the Listing references "verbal, performance, or full scale" IQ scores. The test given by Dr. Nimmer, the WISC-IV, does not use these specific categories. However, plaintiff argues that the ALJ should have considered the WISC-IV alternate scores under a medical equivalence standard, and the Commissioner does not argue otherwise. But cf. Thibeault v. Commissioner of Social Sec., No. 8:13-cv-586, 2013 WL 6498390, at *5 (M.D. Fla. Dec. 11, 2013) (collecting cases translating WISC-IV scores into Listing terms). I also note "that IQ test scores should be read not as a single fixed number but as a range." Hall v.

17

an IQ score at face value – the score must be "valid," see Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir.1999) – but the ALJ did not in the present case dispute the validity of the scores. He did later state that "claimant is not mentally retarded and given the wide fluctuation in some of his IQ scores, some of which reached the 90's it is very likely that claimant's academic problems may be more due to a learning disorder as opposed to borderline intelligence." (Tr. at 21.) However, the ALJ cited no evidence, medical or otherwise, in support of this statement. See Blakes ex rel. Wolfe v. Barnhart, 331 F.3d 565, 570 (7th Cir. 2003) ("[T]he ALJ seems to have succumbed to the temptation to play doctor when she concluded that a good prognosis for speech and language difficulties was in-consistent with a diagnosis of mental retardation because no expert offered evidence to that effect here."); Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). Dr. Nimmer gave no indication that the scores he obtained, which tracked previous results, lacked validity.[12]

---

Florida, 134 S.Ct. 1986, 1995 (2014). "A score of 71, for instance, is generally considered to reflect a range between 66 and 76 with 95% confidence and a range of 68.5 and 73.5 with a 68% confidence." Dr. Nimmer recognized this in his report, indicating 95% confidence that J.E.C.'s full scale IQ score was 68-78. (Tr. at 348.) Dr. Nimmer also noted that previous WISC-III testing showed a full scale score of 68. (Tr. at 345.)

[12]The Commissioner contends that Dr. Nimmer found the 68 score not entirely reflective of J.E.C.'s intellect. As indicated in the text, the ALJ did not discount the score, based on Dr. Nimmer's report or any other evidence, and my review is limited to the reasons the ALJ gave. In any event, Dr. Nimmer made no such finding. He stated: "On the Processing Speed portion he was slow on Coding in part because he had a habit of grounding his performance by touching the target square, then the key part of the form, then back to the target square to match his place of printing. He seemed to need that sort of mechanical process to complete that portion of the task." (Tr. at 349.) This passage may explain why the score was lower, but it does not impugn the validity of the result. The Commissioner also notes that Dr. Nimmer diagnosed borderline intelligence, not mental retardation. Again, the ALJ did not decline to find J.E.C. disabled under Listing 112.05 based the absence of a diagnosis. In any event, the Commissioner cites no authority for the proposition that a diagnosis of mental retardation is

The Commissioner contends that the ALJ found that J.E.C. did not satisfy the "capsule" definition of mental retardation (i.e., "significantly subaverage general intellectual functioning with deficits in adaptive functioning"), despite the one IQ score that satisfied the severity criteria in sub-parts D and E.  See Witt v. Barnhart, 446 F. Supp. 2d 886, 893-94 (N.D. Ill. 2006) (explaining that in order to meet the mental retardation Listing a claimant must satisfy the diagnostic description set out in the capsule, as well as the criteria set out in one of the subsections that follows).  However, the ALJ made no such finding.  He stated that J.E.C. was "not mentally retarded," but he did not relate that statement to the capsule definition.  An agency's decision must be upheld, if at all, on the same basis articulated by the agency. Hanson, 760 F.3d at 762.

### b.    Listing 112.11

Plaintiff also argues that the ALJ failed to explain why he found that J.E.C. no longer met Listing 112.11.  This Listing provides, in pertinent part:

> Attention Deficit Hyperactivity Disorder: Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
>
> A. Medically documented findings of all three of the following:
>
> 1. Marked inattention; and
>
> 2. Marked impulsiveness; and
>
> 3. Marked hyperactivity;

_____

required under this Listing.  See Pennington v. Commissioner of Social Sec., No. 1:13-CV-00591, 2014 WL 4774095, at *9 (S.D. Ohio Sept. 24, 2014) (indicating that a diagnosis of mental retardation is relevant but not necessarily required with a valid verbal, performance, or full scale IQ of 60 through 70).

AND

B. For . . . children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02 [i.e., marked impairment in age-appropriate cognitive/communicative function, age-appropriate social functioning, age-appropriate personal functioning, or in maintaining concentration, persistence, or pace.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.11; see also Brindisi ex rel. Brindisi v. Barnhart, 315 F.3d 783, 786 (7th Cir. 2003).

The Commissioner responds that the ALJ reasonably relied on the reports from the state agency consultants, who concluded that J.E.C. no longer met this Listing,[13] as well as Dr. Nimmer's evaluation, which found no evidence of ADHD.  (Tr. at 21, 347, 352-57, 380-84.)[14] An ALJ may properly rely upon the opinion of a state agency medical expert in determining whether the claimant meets or equals a Listing.  See, e.g., Scheck v. Barnhart, 357 F.3d 697, 700 (7th Cir. 2004).  Plaintiff notes that the consultants and Dr. Nimmer produced their reports in 2009, three years prior to the hearing, and points to later school records documenting problems with focus and behavior (Tr. at 519-20, 591), and medical records documenting issues with self-care (Tr. at 371-73), which the ALJ failed to properly address.    As the Commissioner notes, however, the Listing requires "medically documented findings" of marked inattention, impulsiveness, and hyperactivity.  Plaintiff points to no medical evidence showing that J.E.C. meets the paragraph A criteria.  I thus cannot find harmful error on this point alone. However, because the matter must be remanded for other reasons, the ALJ may on remand

---

[13]The consultants did not consider Listing 112.05.

[14]The ALJ did not specifically endorse the consultants' reports; rather, he stated that he "is inclined to concur with the Disability Determination Services in the sense that claimant no longer has an impairment or combination of impairments of sufficient severity to meet, equal or functionally equal one of the listed impairments."  (Tr. at 21.)

wish to obtain an updated medical opinion.  <u>See</u> SSR 96-6p, 1996 WL 374180, at *4.

### c. Functional Equivalence

Finally, plaintiff argues that the ALJ failed to properly evaluate functional equivalence. At the end of the narrative portion of his decision, the ALJ stated: "As to the issue of functional equivalence, the undersigned finds less than marked limitations in five of the six domains, the only exception being moving about and manipulating objects for which he finds no limitation whatsoever." (Tr. at 22.)  He offered no explanation for these findings.  <u>See</u> <u>Giles ex rel. Giles v. Astrue</u>, 483 F.3d 483, 487-88 (7th Cir. 2007) ("Such a conclusion standing alone does not sufficiently articulate the ALJ's assessment of the evidence as we have repeatedly required."). Earlier in his decision, the ALJ indicated that he "was inclined to concur" with the DDS consultants, but, as discussed below, the consultants' conclusions on functional equivalence did not line up with the ALJ's, so it is unclear if he intended to rely on them on this point.  Even if the ALJ did rely on the DDS, for the reasons that follow, those reports alone are insufficient.

### i. Acquiring and Using Information

In the domain of acquiring and using information, the SSA considers the child's ability to learn information and to think about and use the information.  SSR 09-3p, 2009 WL 396025, at *2.  Relevant evidence may include assessments of the child's cognitive ability as measured by intelligence tests, academic achievement instruments, and grades in school. <u>Id.</u>  Because much of a school-age child's learning takes place in a school setting, school records are often a significant source of information about limitations in this domain.  <u>Id.</u> at *3.  For example, the SSA will consider whether the child is reading, writing, or doing arithmetic at appropriate grade level. <u>Id.</u> at *6.

The first DDS consultant found less than marked limitation, noting three of the IQ scores obtained by Dr. Nimmer. (Tr. at 354.) The report does not mention the 68 score, nor does it discuss any school records. The second report in reaching the same conclusion mentions the same three IQ scores, and a report from J.E.C.'s current teacher indicating that his current instructional level was at grade level. (Tr. at 381A.) Presumably, this was a reference to an October 19, 2009, questionnaire completed by a teacher who had, at the time, known J.E.C. for all of 24 days. (Tr. at 143.) Virtually all of the other school records showed significant delays. For instance, J.E.C.'s 6th grade IEP indicated that he read at a third grade level and did math at a 2.3 grade level. (Tr. at 331, 333-34). His 7th grade IEP said he was functioning at the 5th grade level in reading and math, and the mid-4th grade level in writing. (Tr. at 524, 526.) His 8th grade IEP listed his reading skills in the 5.5 grade level, his math at a 5th grade level, and his writing at the 5th grade level. (Tr. at 542, 544.) His 9th grade IEP again listed reading skills at the 5.5 grade level, math at a 5th grade level, and writing at a 5th grade level. (Tr. at 591.) The ALJ failed to consider this evidence before finding a less than marked impairment.[15]

### ii.    Attending and Completing Tasks

In this domain, the SSA considers a child's ability to focus and maintain attention, and to begin, carry through, and finish activities or tasks. This includes the child's ability to initiate

---

[15]The Commissioner notes that findings made by a state agency consultant must be treated as expert evidence, SSR 96-6p, 1996 WL 374180, at *1, and the ALJ thus reasonably adopted the DDS findings in this case. The conclusion does not necessarily follow from the premise. While the ALJ was required to consider the DDS reports, he was not required to adopt them. SSR 96-6p states that in determining the weight to be given to the opinion of a state agency consultant the ALJ should consider the supportability of the opinion in the evidence, including any evidence received at the hearing level that was not before the state agency. Id. at *2. The record in this case contains much evidence the consultants did not see.

and maintain attention, including the child's alertness and ability to focus on an activity or task despite distractions, and to perform tasks at an appropriate pace. The SSA also considers the child's ability to change focus after completing a task and to avoid impulsive thinking and acting. Finally, the SSA evaluates the child's ability to organize, plan ahead, prioritize competing tasks, and manage time. SSR 09-4p, 2009 WL 396033, at *2.

The DDS reports found no limitation in this domain. The first DDS report relied entirely on Dr. Nimmer's examination, in which Dr. Nimmer found normal attention and concentration. (Tr. at 354.) The second report also cited Dr. Nimmer, along with the teacher questionnaire, which noted slight problems in most areas of attending completing tasks. (Tr. at 381A, 145.) The IEP's again tell a different story, with the 6th grade report indicating that J.E.C. did not complete assignments, and that his attention deficits and decreased reading and math skills negatively impacted his ability to acquire the necessary skills to complete tasks. (Tr. at 332.) The 7th grade report indicated that he was making a real effort to learn but had difficulties with organization, information processing, and maintaining focus. (Tr. at 526.) The 8th grade report said he was easily distracted, disorganized, and had difficulties focusing and maintaining attention. (Tr. at 544.) The 9th grade report stated that he avoided tasks and redirection from teachers. (Tr. at 589.)

The ALJ, apparently declining to follow the DDS on this domain, found less than marked limitations in this domain. As indicated, however, he offered no explanation for the finding or of how the evidence discussed above factored into it.

### iii.    Interacting and Relating with Others

In this domain, the SSA considers the child's ability to initiate and respond to exchanges with other people, and to form and sustain relationships with family members, friends, and

others.  This domain includes all aspects of social interaction with individuals and groups at home, at school, and in the community.  Important aspects of both interacting and relating are the child's response to persons in authority, compliance with rules, and regard for the possessions of others.  SSR 09-5p, 2009 WL 396026, at *2.

The first DDS report, relying entirely on plaintiff's statements to Dr. Nimmer, found no limitation in this domain.  (Tr. at 354.)  The second, noting that plaintiff told Dr. Nimmer that J.E.C. could be needy and demanding, and that the teacher found slight problems in this area, endorsed less than marked limitations.  (Tr. at 381A.)  To the extent that he adopted the second report, the ALJ again overlooked the significant problems set forth in the later school records, including incident notes from 2010-2011 documenting instances of leaving class without permission, horseplay, disrupting class, chronic disruption, refusal to work and follow rules, chronic disruption leading to a suspension, throwing pencils in class, refusal to work and follow instructions, refused to go to class, yelling out of the bus window, slapping another student, and playing and wrestling on the bus.  (Tr. at 519-21.)  The 8th grade IEP also noted behavioral concerns, including arriving to class late or without proper supplies, playing or teasing in the hall during transitional periods, and missing classes.  J.E.C. also demonstrated poor social skills and inappropriate peer interactions, which had a negative impact on his educational performance.  (Tr. at 544.)  The 9th grade report noted worsening behavior, including mean-spirited outbursts, arguments, and disrespectful words.  His refusal to cooperate and speak to teachers in respectful manner typically evolved into a referral of J.E.C. leaving the room.  (Tr. at 589.)[16]

―――――――――――――――

[16]The Commissioner contends that one inconsistent report from 2012 did not make it unreasonable for the ALJ to find less than marked limitations in this domain.  As discussed in

#### iv.     Caring for Yourself[17]

Under this domain, the SSA considers a child's ability to maintain a healthy emotional and physical state, including how well the child takes care of his own health, possessions, and living area. SSR 09-7p, 2009 WL 396029, at *2. The Ruling provides as an example a child who does not feed, dress, bathe, or toilet self appropriately for his age. Id. at *6.

The first DDS report assessed no limitation in this domain. (Tr. at 355.) The second assessed less than marked limitation, again relying on the teacher questionnaire noting slight problems in this area. The report also noted plaintiff's statement that she was working with J.E.C. on expressing anger and frustration appropriately. (Tr. at 382.) Missing both from the reports and from the ALJ's decision is any discussion of the medical records indicating that in 2009 J.E.C. required in-home assistance in completing his activities of daily living and his personal care. (Tr. at 371-73.) These records further noted incontinence episodes at least twice per day. (Tr. at 371.)[18]

#### v.     Health and Physical Well-being

In this domain, the SSA considers the cumulative physical effects of physical and mental

---

the text, the behavioral problems were noted in previous IEP's and other school records. They cannot be passed off an aberrational.

[17]Plaintiff does not challenge the ALJ's conclusion regarding the domain of moving about and manipulating objects.

[18]The Commissioner argues that this evidence is irrelevant because it is dated prior to the cessation of benefits in May 2009, and nothing in the medical records suggested a problem with incontinence thereafter. However, the ALJ did not dismiss this evidence because of the date; he ignored it entirely. In any event, the records related to assistance with personal care are dated from February to June 2009, straddling the termination of benefits. (Tr. at 371-73.) It is also inconsistent for the Commissioner to argue that the ALJ could rely on Dr. Nimmer's January 2009 report (upon which the consultants also relied), yet medical records from prior to May 2009 are off the table. The ALJ must on remand develop the record on this issue.

impairments and their associated treatments on the child's health and functioning.  Unlike the other five domains, which address a child's abilities and functioning, this domain addresses how such things as recurrent illness, the side effects of medication, and the need for ongoing treatment affect the child's body.  SSR 09-8p, 2009 WL 396030, at *2.

The DDS reports in finding less than marked limitations focused on the absence of complications related to J.E.C.'s shunt placement, and on the absence of severe exacerbations of his asthma.  Neither report discussed his headaches.  (Tr. at 355, 382.)  Nor did the ALJ discuss headaches under this domain.  At another point in his decision, the ALJ stated: "There have been some complaints of headache, but there is no evidence to suggest it is related to the hydrocephalus and in any event it would not be incapacitating."  (Tr. at 21.)  However, plaintiff testified that J.E.C. experienced frequent, debilitating headaches.  (Tr. at 644-45.)  Medication helped, but it caused him to sleep most of the day.  (Tr. at 645.)  Of course, the ALJ was not required to accept this testimony, but the ALJ stated that plaintiff "appeared quite credible at the hearing."  (Tr. at 22.)[19]

### d. Conclusion on the Listings

The matter must be remanded so the ALJ can consider Listing 112.05, decide whether to receive updated medical evidence on Listing 112.11, and evaluate all of the evidence and provide an explanation for his conclusion on functional equivalence.

---

[19]The medical records confirm treatment for headaches, both in the emergency room (Tr. at 470-72, 560, 562-67, 579, 582) and with a specialist, Dr. Arain, who prescribed Amitriptyline (Tr. at 570-71).  The Commissioner argues that plaintiff's testimony about J.E.C.'s headaches is not consistent with the record about their frequency or severity.  The ALJ did not reject the testimony on this basis; indeed, he found plaintiff "quite credible."  (Tr. at 22.)

## C.    Speculation

### 1.    Standard

The ALJ is not allowed to rely on his own assumptions about a claimant's impairments or make his own independent medical findings in deciding a case.  See Myles v. Astrue, 582 F.3d 672, 677 (7th Cir. 2009); Rohan, 98 F.3d at 970.  And, while the court should not nitpick at an ALJ's decision, it need not defer to findings based on errors of fact or logic.  See Allord, 455 F.3d at 821.

### 2.    Analysis

Some of the ALJ's key findings in the present case appear to rest more on assumption that record evidence.  Others misstate the evidence.

First, the ALJ appeared to question J.E.C.'s hyperactivity based on "the prevalence of ADHD" in the children's cases he saw.  (Tr. at 21.)  A claimant is entitled to a decision based on the record in his case, not other cases the ALJ has decided.  See Reed v. Massanari, 270 F.3d 838, 843-44 (9th Cir. 2001).

Second, the ALJ concluded that J.E.C.'s lack of recent academic progress was attributable to his poor attendance and lack of motivation.  (Tr. at 21-22.)  However, the ALJ cited no medical or other evidence indicating that J.E.C.'s problems were a "reflection of personal volition."  (Tr. at 22.)  Dr. Nimmer did not share the ALJ's belief that, with a little more effort, J.E.C.'s prognosis was good.  (Tr. at 22.)  Dr. Nimmer noted a "fair to guarded" prognosis.  (Tr. at 349.)

Third, the ALJ stated that while "there had been issues regarding behavior in the past, it has improved claimant citing only one suspension thus far in the current year and one in the

prior year." (Tr. at 18.) At the time of the hearing in October 2012, the school year had only just begun, so noting just one suspension did not add much. Further, the school records noted significant behavioral concerns in 2010, 2011, and 2012, as discussed above. (Tr. at 519-21, 589, 591.)

Fourth, the ALJ stated that J.E.C. was discharged from mental health treatment due to multiple missed appointments. (Tr. at 20.) The record states, and at the hearing plaintiff testified, that J.E.C. was discharged because the therapist left the clinic. (Tr. at 518, 647.)

Fifth, the ALJ stated that J.E.C. had been making progress in school, was not that far off, and that any recent regression was related to poor attendance and lack of effort. (Tr. at 21-22.) As discussed above, the IEP reports show that J.E.C. was consistently three years behind grade level. The ALJ cited no evidence that this gap related to effort rather than a mental or cognitive impairment.

For these reasons as well, the matter must be remanded.[20]

## V. CONCLUSION

Plaintiff argues for remand for an award of benefits under Listing 112.05 or, in the alternative, for rehearing. A judicial award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability. Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005). Unresolved factual issue preclude an award in this case; the ALJ must on remand determine whether J.E.C. meets or equals all of the criteria of Listing 112.05. See Sorenson v. Astrue, No. 10-C-0582, 2011 WL 1043362, at *10 n.8 (E.D. Wis. Mar. 18, 2011) ("That standard is not met here, for the ALJ will on remand have to

---

[20]The Commissioner does not respond to plaintiff's arguments that the ALJ engaged in speculation, misstated the evidence, and overlooked her testimony.

determine whether the scores of 70 and below are valid and whether C.S. has deficits in adaptive functioning.")  The matter will be remanded for rehearing and a de novo decision consistent with this opinion.

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and this matter is remanded to the Commissioner for further proceedings under § 405(g), sentence four.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 2nd day of October, 2014.

/s Lynn Adelman
LYNN ADELMAN
District Judge